Dear Representative Salter:
You have requested an opinion from this office concerning the legality of a particular clause found in the Agreement Incident To Second Amendment To Power Sales Agreement (Agreement) between the Sabine River Authorities of Louisiana and Texas (SRA's) and Gulf States Utilities Company, Central Louisiana Electric Company and Louisiana Power Light Company (Companies) in light of an earlier opinion issued by this office. You are obviously referring to Opinion No. 98-376, which was a general analysis of various sections of Consolidated Power Sales Agreement (PSA) that were deemed relevant to a dispute over the issue of whether or not the current operating guide could be changed to provide for the establishment of 168 m.s.l. as the minimum reservoir level for routine power generation.
In that opinion, it was noted that there was no dispute that SRA's control the draw down of the water level of the Toledo Bend Reservoir; but the SRA's contend that adopting 168 m.s.l. as the minimum reservoir level for routine power generation, instead of following the current operating guide, would be a violation of the Agreement. In the Agreement, the SRA's obligated themselves to actively oppose any activity that would affect or alter the existing rights or contractual relationship of the parties to the PSA. On that issue, this office questioned how the SRA's would be violating the PSA by no longer following the current operating guide since we found no evidence that the operating guide had been adopted as part of the PSA.
Furthermore, the language of the Agreement ifs better understood by examining the Executive Summary, which explains what the Agreement and the Second Amendment to the PSA meant to accomplish. As can be seen from the attached copy of the Executive Summary, the Companies and the SRA's were granted a modest rate increase plus forgiveness over the ten (10) year period of their obligation to repay advance payments for power previously made. PSA Section 3.02A and 3.04.
Thus, viewed in the light of a negotiated settlement, the language of the Agreement does not appear to be illegal or and abdication of the statutory functions and obligations of the SRA's. However, as pointed out in Opinion No. 98-376, interpretation of contracts is more appropriately a function of the judiciary since an opinion of this office does not have the force and effect of law.
Finally, you have asked "what action would be necessary for a Federal Court to decide who controls the lake level?" This would be an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C.A. § 2201; and Fed. Rules Civ. Proc. Rule 57.
We hope that the above will be of assistance to you in this matter.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: ROBERT H. CARPENTER, JR. Assistant Attorney General
RPI/RHC/tp
 EXECUTIVE SUMMARY OF CHANGES REFLECTED IN SECOND AMENDMENT TO THE POWER SALES AGREEMENT AND AGREEMENT INCIDENT TO SECOND AMENDMENT
Gentlemen:
After long negotiations with the power companies, an agreement has been reached affording the Authorities a rate increase and a schedule for forgiving prior advanced payments for power. The following is a summary of the new provisions. They are as follows:
 1. The electric rate under the PSA will be increased from 1.88¢ per kWh to 2.0¢ per kWh for the first five years of the contract term and to 2.1¢ per kWh thereafter.
 2. If the Commission (Texas PUC or Louisiana PSC) ultimately disallows any portion of these increases, the contract rate will be reduced to the level of the allowed portion, not below 1.88¢, and the Authorities will refund the disallowed portion of the rate for the preceding five years or the period of disallowance if less than five years.
 3. The power companies have made advance payments for power to both Authorities under Section 1.21 of the PSA. Under the settlement, the obligation to repay the advance payments for power previously made to the Authorities shall be forgiven by the Companies over a ten-year period.
 4. The Authorities shall not be entitled to seek a rate increase for a ten-year period and, after expiration of that period, any rate increase must be based on the public interest standard.
 5. For that same ten-year period, the Authorities are obligated to oppose, upon Companies' request, any legislation which affects the existing rights or contractual relationships of the parties under the PSA.
 6. If either of the two preceding subparagraphs are violated, that portion of the advance payments for power which has not been forgiven at that time shall not be forgiven and the rate shall be reduced to 1.88¢ per kWh for the remainder of the contract unless otherwise changed.
 7. The Authorities shall each build their portion of the Contingency and Replacement Reserve Fund up to $750,00 within six months. If expenditures are later made out of this fund, then, in any year in which generation equals or exceeds 150 million kWh, the Authorities shall each deposit a minimum of $200,000 as necessary to qualify for C R treatment has been increased from $20,000 to $75,000.
 8. The obligation of the Authorities with regard to indemnity of the Companies was clarified.
 9. The obligations of the respective parties with regard to the purchase of insurance was clarified such that the responsibility for purchasing business interruption insurance will now be that of the Authorities should they opt to buy it.
 10. The Texas Authority will pay the Louisiana Authority $930,000 in four equal installments beginning on the effective date of the contract amendment. The purpose of these payments is to recognize the difference in value received by the two Authorities for the forgiveness of APP. This obligation is not expressed in the settlement documents, but is a separate agreement between the two Authorities.
In a nutshell, the Texas Authority will receive a modest rate increase immediately with a second increase assured after five years. In addition, debt, with a net present value to SRAT of $1.75 million, will be gradually eliminated from the Authority's balance sheet. The Companies gain the assurance of no further rate activity for ten years, a small monetary concession on insurance, clarification of the contract indemnity provisions and safeguards to assure that the Authorities have an incentive to honor the moratorium.